Gabriel Pérez Labrada v. U.S. Attorney General Good morning, Your Honors, and may it please the Court. Parole out of custody is nothing more than the release from custody. It's not a benefit. It does not affect status. It is a fact that happened here and no one disputes it. And now no one disputes that parole was the only legal way that this could have occurred. What we're asking the Court to do is apply law to fact and to determine that the releases here were parole. I welcome the Court's questions. Well, after these cases were adjudicated by the BIA, the BIA has issued a couple of precedential decisions with regards to the role interplay between Sections 1225 and 1226. Should we just remand these matters to the BIA to try to make sense of that administrative precedent in the light of the issues you've presented? I would disagree, Your Honor, and I understand the ACLU's amicus brief requests that. First, after Loper-Bright, I don't think the ordinary remand rule has the same force that it has in the past. And also in this Court's precedent, Calle v. U.S. Attorney General, when the only issue before the Court is a question of law, it's not necessary for a remand for the agency's input. Also, given the nature of the issue, the legal issue has not changed at all, I don't think, as a basis for remand or would be especially helpful from the Board. We are arguing... Help me understand that. You are certainly dead right that in the Loper-Bright world we are in, we will make our own determination regardless of what the agency says. But wouldn't an agency determination on this matter arguably be helpful? It might even be persuasive. It could be wrong. But aren't we looking for the wisest and most information we could get in this interpretive process? What is the downside with a remand, I guess, is the essence of the question. One, I don't think it will make a difference. The EOIR is still continuing to hold its position, at least at the immigration judge level. I've seen orders from immigration judges stating that a matter of QLE is not retroactive, so they're not going to apply it, and just different things. Has the Board spoken on it? I'm not aware of that yet, but I do not believe they would change their position because they're... Like what happened here in these cases, in both cases the Board stated that a matter of Cabrera-Fernandez foreclosed the argument, when that case never even spoke about 1225B2 and doesn't even opine on our argument. And the government has not argued that a matter of Cabrera-Fernandez was even relevant to the outcome in this case. It's treating it as a novel issue. So the ACLU's brief saying that maybe the Board would reconsider Cabrera-Fernandez in light of QLE and the Hurtado case, I think that's going a little too far. I don't think the Board takes the position that... But the issues that you raise deal with the relationship and the coexistence of these two statutes, and they go more to more than just the question of whether or not what happened to your clients constituted some immigration event that now allows adjustment under the Cuban Adjustment Act, right? Because whether or not 1225 or 1226 govern also impacts mandatory detentions for a whole range of non-citizens who come into this country, right? Yes. And so we've put forth our position in the 28-J letters that we agree with a matter of QLE, but not with Hurtado. Perhaps that's an issue that could require supplemental briefing. I understand that what... If you disagree with the two of those, those are both BIA decisions, right? We agree with QLE, but disagree with Hurtado, and they're both... But both of those are BIA decisions, right? Yes. So why isn't a remand for them to try to... For the BIA to try to reconcile its precedent or figure out which one applies or which one doesn't, and whether or not there's tension between them, et cetera? Why doesn't that make sense, as Judge Marcus asked? Setting aside the individual cases before the court, this issue has been plaguing the immigration courts through Miami, and I think there's 100,000 Cuban cases pending in Miami that this case could affect. This is an issue throughout the country. We actually have an argument next month in the Second Circuit on this issue. So I think if this is a prudential question, I think that the importance of the issue is large enough that the court should proceed to decide it. Let me ask you, doesn't that argument cut in exactly the opposite direction? Given the significance of the issue and the number of people who may be affected by it, doesn't that suggest quite to the contrary that we would welcome the views of the BIA on this subject? Might even be persuasive. Might not, but might be very helpful. I just don't have much confidence that... You just have no faith that you say they're going to do the same thing they already did. We already know... That's essentially the argument. We have no reason to believe you'll get anything different on Round 2 than Round 1. Let's move it along and get a judgment. We already know Homeland Security's position from the 28-J letter that was attached there, that despite this change in the views of the Homeland Security and how these statutes work, that the parole should not be granted or given corrective for past releases. The interesting thing about that memo from Homeland Security is that ended up being matter of Hurtado from the board. I know the board is supposed to be an independent agency and acting separately from Homeland Security, but there's very much intertwined policy considerations that affect both the board and the Department of Homeland Security, and they tend to align most of the time. The government has also changed its position during the course of this litigation. Isn't that a relevant factor for whether or not a remand to the BIA is appropriate? They changed their position to agree with us on half of the argument, but there's still the rest of it that... They agree with your interpretation of the statute, they just don't think you should get relief. Yes, exactly. The government is the Office of Immigration Litigation within the Department of Justice writing that, and the board is part of the Department of Justice as well. I believe the way it works is that there's a Deputy Attorney General who oversees all these things. We're getting signals already from the Department of Justice and Homeland Security that they don't want to allow this outcome that we're seeking, and I think a remand would just be futile under those circumstances. Well, the government may also be stuck, because what it wants on the one hand, I think, is for 1225 to apply, because it thinks that that leads to mandatory detention of a huge class of non-citizens who are in this country without legal status, regardless of when they enter. But if they take that position, they may have also bought themselves adjustment by a whole lot of people like your clients. Yes. What I could also point to is a case pending in the Southern District right now. Southern District of? Florida, sorry. Bay of Rubio versus Noam, where we're seeking a putative class action on this very issue, where the government is opposing right now. And they actually requested to have the district court proceeding stayed while this case was pending. So that action is pending in the Southern District today? Yes, before Judge Becerra. What is the name of the case? Bay of Rubio, B-E-L-L-O-R-U-B-I-O, versus Kristi Noam. So it's right now briefed on a motion to dismiss and class certification motion. And there's an application for class certification the district court hasn't ruled on that yet? Not yet. We're still in briefing. Thank you. So in that sense, again, viewing an isolated case with not such a wide effect, I think perhaps prudentially the court would be inclined to remand. But given the nature of what's going on here, we're talking about hundreds of thousands of people. The docket in the Miami Immigration Court, one-third of the cases is Cuban nationals. It's not on the record, but immigration judges are waiting for a ruling. A remand would create delay in the system as a whole. Let's talk about the merits a little bit. Yes. If your interpretation and that of the government now is correct, what remains of 1226? Are the majority of district courts in the country right that each statute deals with a different class of non-citizen? Yes, I think the key phrase in 1225B2 is seeking admission. And the statute actually uses that in a different section as well in 1225A3 with regard to the inspection rule, which states all aliens, including alien crewmen who are applicants for admission or otherwise seeking admission or readmission, et cetera, shall be inspected. So the statute does use the terminology of applicant, application, applying differently from seeking. So in 1225B2, we think the seeking admission is dispositive. And what the district courts are doing, I'm not aware of any district court disagreeing with matter of Q. Lee, which is a much narrower case than Hurtado. They have been disagreeing with Hurtado, and we believe that's correct. As we stated in our 28J letters, we would request... So who does... I'm sorry. Simplify this for me as a non-immigration expert. Under your parsing of the two statutes, to what class of non-citizens or aliens does 1226 apply? 1226 is to people who are here, present in the United States. Jennings v. Rodriguez makes that distinction between people arriving at the borders and those who are present. So in matter of Q. Lee, the board's outer limits of that ruling is that it applies to people who just crossed the border within a day and are encountered near the border. So what we're trying to say is that under 1225B2, that applies to people in the process of arriving in the United States, even if they've crossed the boundary. I don't want to dumb this down, but essentially I understand your position to be that 1226 applies to non-citizens who have made it past the border without being detected or caught and are in the United States for a period of time. And so if the government wants to detain them, it has to proceed under 1226. But if an alien is detained, apprehended, arrested on the way in at the border, then that person is deemed to be an applicant for admission and 1225 applies. It leads to mandatory detention on the one hand, but it also permits in the case of your clients a later petition for adjustment of status. Yes, and I would add some factual context to this in the 485. Is that right though, generally? Yes. Because when the statute, I think there's a good comparison to what happened before IRIRA because it was the concept of whether someone committed an entry or not, whether they've accomplished an entry. It's whether you've evaded inspection successfully or perhaps were turning yourself in at the border. So there is a district court case from the Southern versus Rivkind, which they go up on appeal. And so what happens, to add even more history if I may, during the rafter times in the 80s and 90s, a lot of large populations of Cubans and Haitians were arriving in the Keys. And what would happen is that Cubans would be put into deportation proceedings while Haitians would be put into exclusion proceedings. And the immigration courts were filled with litigation about whether they actually evaded inspection or not because being in deportation proceedings for a Haitian would be important because after seven years they could apply for suspension, whereas Cubans would have wanted to be in exclusion because they're at liberty. That means they had been paroled and they can seek Cuban Adjustment Act. So there was litigation in the district courts here in Miami challenging termination of exclusion versus deportation proceedings under this rubric of whether an entry had occurred of inspection being avoided or not. So we think that has somewhat carried over with modification. And the modification being, look, if you've evaded inspection, you're inadmissible now, which switches the burden of proven proceedings. But at the same time, the way 1225B2 is written, that you have to be an applicant for admission who is also seeking admission, retains that line of whether you've successfully evaded inspection or not. And many times with the Cubans that have been arriving recently, they arrive at the border seeking border patrol. There was actually a time in Arizona where there was a fence with the gate open, border patrols just sitting there processing people that way. And a line would form. Okay, Mr. Pranath, we've let you go a little bit over your time. You've saved your time for rebuttal. Thank you. Okay. Mr. Ogumori. Good morning, Your Honor. I represent the United States Attorney General in this case. This petition for review should be denied because the petitioners, having never been granted parole, are statutorily ineligible for adjustment of status under the Cuban Adjustment Act. But you all admitted them in under 1225. And that means you supposed to have mandatory detained them, quote, at the border, and you didn't. So the only way you could allow them to go leave would be under humanitarian parole, correct? That is the current understanding, correct, Your Honor. Now you all are saying, well, that was wrong. They should have came in under 1226, correct? That was at the time, yes. At the time, there was a dispute. You mispapered it. The government mispapered it and caused the problem of them being under 1225. And the only way under 1225 they could be released out into the country is through humanitarian parole, right? That is the current understanding, correct. So what you're asking us is say, well, you can't convert this court. You got to leave them under 1226. How do you get to that point? Well, first and foremost, at the time DHS released the petitioners under section 1226, that was the government's understanding of the law. And that's not the government's position now. The government's position now, I know you all said you used to have discretion between selecting 1225 and 1226. But the government's position now is that they were, they came in under 1225. Now that 1226, it could have been conditional parole. That's not the case. Well, as a matter of fact, the petitioners here were issued documents showing that they were released under section 1226. That is simply undisputed. There is no factual record, documentary record here that they were actually granted parole, that they were considered for urgent humanitarian relief. So if they were released under 1226, how did they get released the way they were released? Well, at the time, DHS was permitted to release them under section 1226. Now in retrospect, yes, that should have been, that should not have been authorized. But it remains the fact that they were released on their own recognizance and under board precedent. So they're released under 12, okay. This is a mess. It's a mess. And it's caused by the administration's change in, and I'm not blaming you for that, but the administration's change in legal interpretation. You're saying, as you understand the law today, okay, did they come in under 1225 or 1226? Under section 1225. Okay. If the law is always supposed to mean the same throughout, regardless of people's misinterpretations of the law, and they came in, and let's say you're right, and it's all 1225, and they should have, they came in under 1225, they were mispapered, as Judge Jones said, under 1226, why don't they get the detriments of 1225 and the benefits of 1225? The detriment is, they should have been, if you're right, they should have been detained mandatorily at the border. But you messed up because you didn't understand the law to be that way, so they got the benefit of it. They got lucky. But why don't they get the benefit of 1225 too, which is, they're an applicant for admission, and if they're eligible for adjustment of status under the Cuban Adjustment Act, they can seek it. You can't have your cake and split it up in two ways so that you get the good side of it and not the bad side of it. You can't get the mandatory detention that the administration wants for almost all aliens and deny a class of aliens that you mispapered the benefits of that severe scheme. So I would like to emphasize that when the petitioner mentions mispapered, it's not as if DHS had intended to grant parole, but then some clerk had issued the wrong papers. DHS, in this case, intended and did, in fact, release the petitioners under Section 1226, and it is clear that... You're saying that was wrong. You're saying that was legally unauthorized, right? Under the current understanding, that is correct. They should only have been granted... That current understanding language is just not helpful. Okay? Because the next administration is going to come in and say, the current understanding is that the prior administration had it wrong, and although they came in and were papered under 1226, and we told everybody 1225 in 2025, now in 2028, we think it's back to 1226. That can't be the way the world works. I would agree, Your Honor, and I think the point of the government here is that it is irrelevant whether the government correctly or incorrectly released the petitioners under Section 1226, because as a matter of fact, they were, in fact, released under 1226, right or wrong, and we know that... But they could not have been released under 1226. If they did not come in through entry or port, where the law is now, they're supposed to be detained, and they were not. So therefore, they had to be released on humanitarian parole. They could not be released under 1226. I understand the logic, Your Honor, but there are instances when DHS perhaps waved somebody through into the United States that is not entitled to enter the United States, just because that procedural entry was regular, does not accord the alien substantive change in their immigration privileges. Aren't they considered to be applicants for admission of 1225? Okay, let's change the timeline. These two, they're two, one woman, two women, Mr. Labrada? There are four, a family of four, but three of them in Castillo-Casanova, and a family of two in Labrada. All right, let's just say these persons. These persons come in today in the same way that they came in years ago. What happens to them? They come in at the border, and they are detained at the border for inspection. What happens to them? They will be subject to mandatory detention under section 1225. Are they an applicant for admission under 1225? Yes, Your Honor. Do they get to apply for adjustment under the Cuban Adjustment Act? No, Your Honor, unless they're granted parole. They're released in the same way they were released in this case? If they are granted parole. Yes, same thing that happened the last time. No, last time they were released on their own recognizance. That's a factual difference, Your Honor. Is it a legal difference? Have you pointed us to anything that establishes a difference between ROR and parole for purposes of the immigration laws? Yes, Your Honor. In matter of Castillo-Casanova, as well as Cabrera-Fernandez, as well as the arguments laid out in the answering brief, there are significant differences between persons who are released on their own recognizance and individuals who are granted parole. The board has explained that individuals who are granted release on their own recognizance, for example, do not stop accruing unlawful presence in the United States, whereas persons who are granted parole do stop accruing unlawful presence in the United States. As well, Section 1226 is not encumbered, such as in a grant of parole, which can only be granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. There's also differences with respect to employment authorization, who gets to exercise the discretion to grant parole, which is exclusive to the Department of Homeland Security, as opposed to 1226, which is shared between the Attorney General and the Secretary of Homeland Security. To say the least, they are two separate provisions in the INA with different consequences and different eligibility considerations. And the board's holding, in matter of Cabrera-Fernandez, as well as Castillo-Padilla, that those two provisions are not coterminous, that one who is released on their own recognizance has not been paroled for purposes of adjustment of status. That remains true regardless of the government's change in position or change in understanding with respect to Section 1226. Tell me how they could have been released on their own recognizance if they came in under 1225. So, at the time these petitioners entered the United States in 2021, DHS was under the understanding that it could exercise discretion between 1226 and 1225. That is just a fact. So they acted illegally? At the time, they believed they did so. They acted illegally? Oh, illegally. Illegally. So, at the time, that was not the government's understanding. But in retrospect, yes, it was unauthorized. The agency acted illegally. In retrospect, that's our understanding. But at the time, the government, in good faith, applied the law. No one's accusing the government of bad faith with what happened way back when. Don't misunderstand us. But, see, we're trying to make sense of what effect to give. If we get to the merits of what effect to give what happened to these persons way back when, when you're telling us that there's a difference, a legal difference, between release on their own recognizance and parole. But you're also telling us that they could not have been released on their own recognizance back then. So that's a legal error. So what are we supposed to make of that release at the time? How do we characterize it? So that legal error, even if it were construed as such, it does not— You told me that it is a legal error. I don't want to put words in your mouth, but you're telling me that they acted illegally. Illegally may be too strong a term. They acted unlawfully. Am I right about that in giving them release on their own recognizance? Because under your view, they could not have done so. That is correct. It was unauthorized at the time. They had no authority to do that. Right. That is our current understanding. So what effect do we give to a legally unauthorized release of own recognizance way back when? So the effect that the court can give is not what the petitioners are asking for. Because again, even if DHS had made a mistake or an error, let's assume that that's the word we choose here. Even if they did so, that does not mean that DHS had actually granted them parole or that the court could construe what only DHS can grant as something DHS actually didn't. I mean, that would be contrary to the factual realities of the case. That DHS in this case, whether right or wrong, had released the petitioners on their own recognizance. Those are the facts. And those facts, the fact that somebody is granted 1226 does not mean that they were granted parole. That is the law. And the government's change in position does not change that distinction in the law. Do we need to appoint amicus to defend the BIA's decision in this case and reliance on 1226? No, Your Honor. The BIA has already announced— You're not defending the rationale of the single-member BIA decision in this case, right? We are. The BIA in this case relied on the distinction between 1226 and 1182. It said, as a matter of fact, parole has not been granted. What actually happened was that these individuals were released on their own recognizance. And that, as a matter of law, the effect of that— But it also found that they were released under 1226. Yes, yes. So as a matter of fact, they were released under 1226. And the legal effect of that— As a matter of law, they were not. No, as a matter of law, they were not released on parole. That's the difference, Your Honor. As a matter of law, they were not released under 1226 because you say 1226 has no application to individuals like them. It could not have been. It's a legal impossibility. If your view, if your current view of the law is right, they could not have been released under 1226. Am I right about that? I think— The answer is yes, right? Well, yes and no, Your Honor. Yes in the sense that if the law as we understand it today were applied, then yes, they should not have been released. But no— They could not have. Since you say it's exclusive and mandatory, it's not should not. It's cannot. Correct. But DHS does make errors from time. But for example, individuals who are waived into the United States, although they're not entitled to enter the United States, sure, DHS is a government entity run by people, and there may be mistakes. But just because there's an error does not mean that there are substantive immigration privileges conferred on that individual. If— All right. Let's turn to another issue. Do 1225—same question I asked, Mr. Pratt—do 1225 and 1226 apply to different classes of non-citizens in the country? So if I understand the question correctly, yes. If you're right about 1225 and its scope, who does 1226 fit? Well, 1226 primarily applies to individuals who are deportable from the United States. But it could also— But everybody who enters without inspection is deportable. They're theoretically deportable. Until they get status or they get asylum or something else, they're deportable. So that can't be the meaning of 1226. Well, 1226 applies to all individuals pending a removal proceeding on a warrant of arrest. And it also has provisions for mandatory detention of criminal aliens, which invoke both deportability and inadmissibility. If you've already detained somebody under 1225, 1226 doesn't apply under your view, right? Well, it could. It could apply in separate situations. For example, 1225 v. 2 specifically excludes stowaways and crewmen, as well as Section 1226— But those people are not subject to 1225, then. They're excluded. So of course 1226 kicks in. Right. But if you're covered by—I'm really trying to make sense of it. I'm not trying to be hard on you. If 1225 applies under your view of exclusivity, 1226 is necessarily inapplicable to them, right? Or am I mistaken? So I believe that might not be the case because 1226C has more stricter requirements against releasing criminal aliens. But I think it's important to note here— So they're not exclusive? —that the parties here do not disagree that they're subject to 1225 v. 1. No, that's not my question. I'm not concerned about the parties' agreement. I know the parties have some sort of agreement on some issues. I thought your position was that individuals, like the petitioners in this case, are subject to 1225 and 1225 only. Am I mistaken about that? Because if I am, I need to rethink this whole case. Right. The petitioners in this case, yes, they are subject to Section 1225. Can 1226 ever apply to them if they are subject to 1225? I'm not sure I can answer that question right now, but it doesn't— Because you say it's exclusive. So if it's exclusive and they're covered by 1225, the concentric circles never meet. There's no common ground. That's the problem I'm having theoretically with your argument. I thought it was at least simple to understand in concept that 1225 for individuals like these petitioners is exclusive and mandatory and nothing else happens. That's it. You get 1225, that's all you get. But now you're hedging on whether or not they are also subject in some scenarios to 1226, and that is just confusing me. So I do regret that I can't speak until—you know, I can't fully answer your question here, but I do note that there are two appeals cases pending in this court right now, where the government is defending this precise issue about Section 1225 and 1226. So again, this case is not appropriate for— Do you know the names of those cases? Yes. And by the way, have they been argued? No, the government's filed its opening brief, I believe, a few days ago. In both cases or one of them? I know for sure in one. OK. If you could give us the names and if you have the case numbers, that would be great. I do. It's Cerro Perez, number 25-14075, and Hernandez-Alvarez, that's number 25-14065. And neither have been argued and they're in the briefing stage, counsel? That's my understanding, yes. Let me ask you a question we asked your colleague. Time is up, time is short, but I'd like to get your answer as well. We asked your colleague, because the concession represented a substantial departure from the statutory scheme the BIA confronted in the initial review and implicates issues, matters, questions that it never reached. We asked the question of whether the wisest course here was to grant the petition for review and remand the matter to the BIA so it may consider the impact of its change in law. Your colleague said, bad idea because they're not likely to do anything different on round two than they did on round one, notwithstanding the fact that they've changed their mind and come up with a different review of the operative statute. What's your view? What's the government's view about the wisdom of remand? Well, we don't think that remand is necessary, but we're not absolutely against it. The government's position is that, what is that issue? No, I understand. You've said we don't even have jurisdiction, right? I mean, I understand. Why shouldn't we remand in this case is my question. This case is actually fairly straightforward, Your Honor. One is these individuals were released under Section 1226, and that Section 1226 is not a grant of parole, and therefore the petitioners are ineligible for adjustment of status. The government's change in position doesn't change the fact that 1226 is not a grant of parole. And the matter of Cabrera-Fernandez relies on this legal distinction, and that legal distinction does not change. So even if the case were remanded, Cabrera-Fernandez would still apply. Now, that being said, if the court believes strongly— Do you agree with him that a remand would be futile? They'll say the same thing on round two. I can't speak for the board, Your Honor, but it appears that it would be. But if the court felt strongly that remand is appropriate, then of course— Well, the object was to give them an opportunity and give us the opportunity to consider the wisdom, right or wrong, of what they have to say. Might be wise, might not be, might be persuasive, might not be worth anything. It might be, Your Honor. If the court were to find that there is some grant of parole by operation of law, that is to say that DHS had done one thing as a matter of fact, but that should somehow be construed as something completely different, then, yes, the case should be remanded to the board so that the board can look at that in the first instance and provide its reasoning on the issue. Your answer is a maybe to my question. Yes. Thank you. Thank you very much. Your Honor, with respect to remand, we'd have two more points. One, as we've seen, the change in administration has been a change in the interpretation of 1225. But the fact is that that interpretation has changed since the 90s and then under the Bush administration, and then here again, as shown by the INS memos and the Caldebella memo. And if the court were to remand, there's a possibility that there might be a change in administration again, and we're probably back at square one, responding to the original arguments that the government had made in its opening briefs. But to the extent the court is inclined to remand, we would ask that the panel retain jurisdiction and set some sort of deadline for the board to respond or perhaps request status reports in the time being. I believe the court has the power to do that under the All Writs Act. Aside from that, the argument we're making is not novel. The board did exactly what we're asking in matter of O. The Seventh Circuit did the same in the Vitale case and the Ninth Circuit did it in the Medina-Ferdinand case. You look to the law that applies, you apply to the facts, and then you decide what the only outcome could have been legally. And here, as the government concedes and agrees, is that these people could only have been released on parole. The law is what it means when Congress enacted it, not dependent on a change in interpretation of an executive body. And we ask that the court vacate, grant the petition for review, and remand the case for a hearing on adjustment of status. Thank you. All right, thank you both very much. All right, that concludes the week. We're in recess.